IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| VANESSA K. BUSH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:16-cv-00129 |
| | ) | Senior Judge Haynes |
| v. | ) | |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

Plaintiff, Vanessa K. Bush, filed this action under 42 U.S.C. § 1383(c)(3) against the Defendant Carolyn W. Colvin, acting Commissioner of Social Security, seeking judicial review of the Commissioner's decision denying Plaintiff's application for disability benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1385.[1] On July 11, 2012, Plaintiff filed her application for benefits under Title II and Title XVI, alleging an onset date of March 1, 2003 that Plaintiff later amended to January 27, 2005, and later to July 11, 2012. (Docket Entry No. 10, Administrative Record at 19, 1388). Plaintiff asserted a disability based upon her major depressive disorder, mental limitations, osteoarthritis, degenerative disc disease, and obesity. Id. at 22. Plaintiff's applications were denied initially on March 9, 2013, and upon reconsideration on July 18, 2013. Id. at 50, 60. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on her Title XVI claim, but withdrew her Title XII application that the ALJ dismissed. Id. at 19-20.

---

[1]Plaintiff earlier filed successive applications on June 3, 1992; July 1, 1996; March 4, 1999; August 15, 2001; and December 20, 2001, but those applications were denied. On March 19, 2003, Plaintiff's applications for benefits were denied based upon a finding that she could perform a range of light work activity. Plaintiff filed another application that was denied on August 9, 2006, and subsequently filed applications on March 5, 2010 and May 20, 2011 that were also denied.

The ALJ denied Plaintiff's Title XVI application and found Plaintiff retained the ability to perform light work. Id. at 24. The ALJ found that Plaintiff had "severe impairments," of "mild mental retardation, major depressive disorder, osteoarthritis, degenerative disc disease, and obesity," but Plaintiff's varicose veins and chest pain were not severe impairments. Id. at 22-23. Plaintiff appealed the ALJ's decision to the Appeals Council, that denied Plaintiff's request for a review. Id. at 10.

Before the Court is the Plaintiff's motion for judgment on the record (Docket Entry No. 17) contending, in sum, that the ALJ erred in evaluating the testimony of Plaintiff, Plaintiff's mother and the opinions of Plaintiff's examining physicians as well as her finding that Plaintiff did not have a mental impairment. The Commissioner responds that the ALJ properly evaluated the testimony and her decision is support by substantial evidence. (Docket Entry No. 19).

## A. Review of the Record

From the extensive record, the parties cite the following facts: Plaintiff was 41 years old as of the date of her latest application and 44 years old at the time of her hearing. Plaintiff was graduated from high school with a grade point average of 2.59, ranking her thirty-fourth in a class of sixty-four graduates. (Docket Entry No. 10, Administrative Record, at 320). Plaintiff notes that her "[m]ajor classes were in resource special education." Id. Plaintiff's transcript reflects grades of "S" and "E" in the ninth and tenth grade courses. Id. As Plaintiff explained at her hearing:

Q     Okay. And what's the highest grade you finished in school?

A     Graduated high school, 12th grade.

Q     Okay. And when you were in high school, do you remember being in any special education - -

| | |
|---|---|
| A | Yes. |
| Q | - - classes? |
| A | From first grade all the way to 12th. |
| Q | Okay. And were you in there all day, or did you have, like, certain classes that you recall? |
| A | Part of the day. |
| Q | Okay. |
| A | Where we're - - I wasn't there all day. I did have some regular classes, too. |
| Q | Okay. |
| A | Just some. |
| Q | And what types of classes do you remember that you had your special - - |
| A | Special, spelling, English, social studies. That's the main ones. And math. Never went through algebra. |

Id. at 1403-04.

As to her employment history, between 1997 and 2007 Plaintiff worked for thirty-two different employers. Id. at 123-28. Plaintiff's longest period of work for one employer was six or seven months. Id. at 123. From 2004 to 2007, Plaintiff was a seasonal employee with the Salvation Army and an averaged 4.4 employers per year. Id. at 123-28.

Plaintiff identified her severe impairments as major depression, anxiety, mental retardation, "[a]goraphobia- [a]nxiety when placed in public places," and high cholesterol. Id. at 231, 258. Plaintiff described her impairments as follows:

| | |
|---|---|
| Q | Okay, so, Ms. Bush, tell me what you believe is keeping you from getting a job and, keeping it full-time. |

A      I'm having trouble understanding, when I do do a job, instructions. I'm having trouble with my legs and knees, and -- because of the veins, and numbness in my thighs, and all that medically.

Q      Okay. Let's start physically first, okay?

A      Okay.

Q      You said your knees, and your veins, and your, your legs medically, Let's --

A      Yeah.

Q      -- talk about that. Tell me what's going on with your knees and your legs.

A      Knees, I've got a lot of arthritis; and varicose veins, too. But kneeswise, I'm having a lot of, like, arthritis and, like, hurting in my knees now.

Q      Okay. Is it both knees that bother you?

A      It's both of them now.

Q      Okay. Okay. And the arthritis pain that you feel, is that there all the time, or does it come and go?

A      It comes and goes.

Q      Okay. What types of things seem to bring it on?

A      I've fell several times on them, and now, they're very -- they've got a lot of arthritis in them now. And the veins are from standing and working so long, and that's when they popped up. And the thighs, I don't know if it's related to my diabetes or not, you know? So -- in the, the numbness part.

Id. at 1408-09. At the time of the hearing before the ALJ, Plaintiff lived with a boyfriend and a roommate in a mobile home purchased by her mother who paid Plaintiff's living expenses and wrote checks for Plaintiff. Id. at 1418, 1420-22.

Plaintiff's mother testified at the hearing before the ALJ that Plaintiff had been unsuccessful at work because "[s]he had trouble understanding directions, how to do things. There's times when

her temper -- she would get mad at something and flare up at a customer or someone, and (INAUDIBLE) manager . . . would fire her," but Plaintiff quit two or three jobs. Id. at 1423. According to her mother, Plaintiff qualified for food stamps, but exhausted them before the end of the month. Id. at 1425. Plaintiff's mother stated that her daughter "has problems with her legs and would not be able to stand for multiple lengths of time . . . . [T]hree to four years is as long as I've been aware of them." Id. at 1423-24. Plaintiff's mother stated that in her personal care, Plaintiff let herself go at times. Id. at 1422.

The Commissioner notes that as of January 2014, Plaintiff exercises three times a week for thirty minutes. Id. at 1041. The Commissioner also quotes a statement by Plaintiff on October 22, 2014 that "I am doing really good, I am taking my meds and doing well. Stable for awhile now." Id. at 1069.

On October 24, 2012, in a Psychological Evaluation for Tennessee Disability Determination Section, Dr. Jennifer Hanket, a psychologist, and Jeffrey W. Viers, a psychological examiner, administered the Wechsler Adult Intelligence test that showed Plaintiff's mental condition as follows:

> Verbal Comprehension Index Score = 68; deficient range; 2nd percentile
>
> Perceptual Reasoning Index Score = 73; borderline range; 4th percentile
>
> Working Memory Index Score = 77; borderline range; 6th percentile
>
> Processing Speed Index Score = 68; deficient range; 2nd percentile
>
> Full Scale IQ Score = 66; deficient range; 1st percentile

Id. at 535. The examiners concluded that Plaintiff's "Full Scale IQ Score falls in the deficient range which is consistent with Guidance Center records indicating that she has a history of mild mental

retardation." Id. at 536.

Viers, who conducted the consulting examination, noted that Plaintiff's "[g]rooming was lacking, but hygiene appeared adequate. She seemed to have a slight body odor about her." Id. at 532. Viers also noted:

> Eye contact with the examiner was very good. She was restless and wringing her hands nervously. She was oriented in all spheres. Her speech was normal. She seemed moderately anxious and mildly dysphoric. She was impulsive and talked incessantly. She was a fair historian. She was able to recall three items visible in the examiner's office immediately and at one and five-minute intervals. **There were no signs of exaggeration on simple malingering items**. She was able to identify the president, his predecessor, and a recent news event. She likely has moderate concentration impairment and gets off task easily much of the time. She reports having suicidal thoughts in September 2012, but she was [sic] never made a suicide attempt. This was only because she was in jail after assaulting her boyfriend. She reports no history of suicidal ideation, otherwise. She reports no history of homicidal ideation or actions otherwise. She was given a safety plan to follow in case of an emergency. There were no signs or [sic] mania or psychosis. Thought process was tangential with non-bizarre content. Insight seemed fair. Judgment seemed likely very impulsive and very reactive.

Id. at 534 (emphasis added).

As to Plaintiff's physical condition, the parties cite the following findings of Dr. David L. Winkle who examined Plaintiff in 2010:

> SKIN EXAM: Does reveal varicosities in the upper and lateral thigh on the left side and also varicosities on the right side in the inner aspect of her right leg. In this area, she has tenderness over the varicosities. There is no edema noted on either side.
>
> \* \* \*
>
> EXTREMITIES: Other than the varicosities . . . .

Id. at 382. Dr. Winkle's diagnosis was "varicosities bilaterally in the lower extremities." Id. at 383. Dr. Winkle explained that Plaintiff "has normal strength and dexterity in the upper extremities. However, with the varicose veins, she would be impaired with prolonged walking and prolonged

6

standing longer than 30 minutes. These would appear to be her disabilities based on this current medical evaluation." Id.

On May 10, 2013, at the Middle Tennessee Medical Center, Plaintiff was examined and this examination revealed "[r]ight, anterior, lateral, knee, aligned, tenderness, swelling, inc pain w/ stress of knee, enlarged varicosities to bilat legs, w/ tenderness to R leg, good distal pulses, sensation intact, no erythema, no ecchymosis, no deformity." Id. at 603. A doppler ultrasound showed "[n]egative right lower extremity venous Doppler ultrasound. No evidence of DVT." Id. A diagnostic x-ray of the right knee revealed "[m]oderate to severe osteoarthritis RIGHT knee greatest within the medial and patellofemoral compartments. Small RIGHT knee effusion. If knee symptoms persist, MRI should be considered for further evaluation." Id. at 608.

Plaintiff also cited the July 30, 2010 physical residual functional capacity assessment ("RFC") of Dr. Sudhideb Mukherjeen, a medical consultant, who found that Plaintiff could stand and/or walk for two hours in an eight hour work day. Id. at 387, 393.

The ALJ cited undisputed exhibits reflecting imaging tests in 2012, 2013, and 2014 that revealed Plaintiff "consistently displayed a normal range of motion, gait, and station, even during periods of exacerbation." Id. at 27 (citing Exhibits B17F, Emergency Room Records dates 12/13/2012-06/21/2013, id. at 562-701; Exhibit B26F, Emergency Room Records dated 6/15-2013-08/24/2014, id. at 770-1018).

### B. Conclusions of Law

The Social Security Act defines "disability" as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

7

of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. § 1382c(a)(3). A reviewing court's evaluation of the Commissioner's decision is based upon the entire record in the administrative hearing process. Jones v. Sec'y, Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). Judicial review is limited to a determination of whether substantial evidence exists in the record to support the Commissioner's decision, and whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health and Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the ALJ's decision must stand, if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

As to the ALJ's assessment of the opinions of Dr. Winkle, an examining physician, and Dr. Mukherjeen, a consultant, on Plaintiff's ability to stand or walk, those opinions were based on examinations in 2010. Social Security regulations describe three types of medical sources: non-examining sources; examining but non-treating sources; and, treating sources. See 20 C.F.R. §§ 404.1527, 416.927 (evaluating medical opinions); 20 C.F.R. § 416.902 (terms defined); SSR 96-2p. A non-examining source is a physician, psychologist, or other acceptable medical source who has not examined the claimant but provides a medical or other opinion on claimant's medical record. Id. An examining but non-treating source examines the claimant, but does not have or did not have an ongoing treatment relationship with the claimant. Id. A treating source examines the claimant and

has or had an ongoing treatment relationship consistent with accepted medical practice. Id.

The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion, Gayheart v. Comm'r of Soc. Sec., 710 F.3d 365, 376 (6th Cir. 2013), but the ALJ is not procedurally required to give "good reasons" for the weight given to the opinion of a nontreating examining source. See Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 514-15 (6th Cir. 2010) ("However, this requirement only applies to treating sources"); Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 876 (6th Cir. 2007) ("SSA requires ALJs to give reasons for only treating sources"). In the Sixth Circuit, opinions by consulting or non-treating doctors need not be evaluated in accordance with the treating physician rules. See Rudd v. Comm'r of Soc. Sec., 531 F.App'x 719, 730 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527 and Barker v. Shalala, 40 F.3d 789, 794 (6th Cir.1994)).

The ALJ considered the opinions of these doctors in 2010 in light of the more recent imaging test results in 2012, 2013, and 2014. Given the more recent medical imaging test results and Plaintiff's most recent statements about her physical condition cited by the ALJ, the Court concludes that the ALJ had rational bases to decline to accept the opinions of Drs. Winkle and Mukherjeen on Plaintiff's physical limitations.

As to the ALJ's evaluation of the credibility of Plaintiff and her mother, the ALJ cited imaging test results in 2012, 2013, and 2014 on Plaintiff's physical impairments and Plaintiff's most recent statement that she was doing well with her medications and was exercising three times a week for thirty minutes. With this proof, the ALJ declined deference to the Plaintiff and mother's opinions on Plaintiff's impairments. The Sixth Circuit has held that "an administrative law judge's credibility findings are virtually 'unchallengeable.'" Ritchie v. Comm'r of Soc. Sec., 540 F.App'x 508, 511

(6th Cir. 2013) (quoting Payne v. Comm'r of Soc. Sec., 402 F.App'x 109, 112-13 (6th Cir. 2010)). The Court concludes that the ALJ had a basis in rejecting Plaintiff and her mother's testimony given the 2012, 2013, and 2014 test results on Plaintiff's physical condition.

The critical issue concerns Plaintiff's mental impairment based upon her depression, anxiety, and intellectual disability. As of August 1, 2013, SSA replaced the term "mental retardation" with the term "intellectual disability" in the Listing of Impairments and in other appropriate sections of SSA's rules and regulations. 78 FR 46499-01, 2013 WL 3936340. For this impairment, Listing 12.05C has three requirements. First, Plaintiff must have significantly sub-average general intellectual functioning with deficits in adaptive functioning manifested before the age of 22. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05C. Second, Plaintiff must have a valid verbal, performance, or full scale IQ of 60 through 70. Id. Third, Plaintiff must have some other mental or physical impairment which imposes an "additional and significant" work-related limitation or another "severe" impairment. Id.; see also 20 C.F.R. § 12.00A; Peterson v. Comm'r of Soc. Sec., 552 F.App'x 533, 539 (6th Cir. 2014) (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.00A, 12.05C); Foster v. Halter, 279 F.3d 348, 354-55 (6th Cir. 2001)).

To meet listing 12.05 a claimant must satisfy the diagnostic criteria in addition to having the required IQ score. Foster, 279 F.3d at 354-55. The ALJ's findings on this issue were as follows:

> Turning to Listing 12.05, this Listing refers to significantly sub average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> First, Listing 12.05 A, B, C or D is only be met when the evidence demonstrates or supports onset of the impairment before age 22. It is not disputed that the claimant exhibited evidence of mild mental retardation prior to age 22. However, the other

> criteria in 12.05A, B, C, or D must also be demonstrated prior to age 22. The representative argues that the claimant's previous IQ scores are invalid and that more recent 2012 IQ testing from psychological consultative examiner (CE) Jeffrey Viers, MA establishes significantly subaverage intellectual functioning prior to age 22. Based on this argument 12.05A and B are not at issue. . . .
>
> 12.05C requires a valid verbal, performance, or FSIQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. The representative argued functional equivalence to Listing 12.05C based on Mr. Vier's October 2012 IQ scores (Exhibit B12F). During this examination, the claimant's WAIS-4 scores showed verbal comprehension score of 68 and a full scale IQ of 66. Mr. Viers admits these scores were significantly lower than 2001 scores showing verbal IQ of 83, performance IQ of 78, and FSIQ of 79 (Exhibit B1A). The representative argues the 2012 scores are more valid and that previous scores were higher only because the claimant was benefitting from formal schooling. However, this argument is unsupported because the claimant was 31 years old in 2001 and was not in formal school at the time of testing. The representative then cites the claimant's special education classes and fleeting past work in effort to prove mental retardation by IQ scores of 70 or less (prior to age 22). The undersigned notes the 2001 scores were obtained much closer to age 22 than Mr. Viers 2012 scores. As for special education classes, the claimant graduated from high school with a grade point average of 2.59 despite being in some resource classes. The record indicates that the claimant was employed in numerous jobs but this was not because the claimant was incapable of performing various tasks but rather a lack of motivation instead. Nor is there any indication the claimant's adaptive functioning was at a lower level before age 22 than it is currently. Again, the claimant cares for herself, performs household chores, keeps appointments, gets along with others, uses public transportation, and shown the ability to perform simple and low-level detailed tasks in previous jobs.

(Docket Entry No. 10, Administrative Record, at 24-25).

Plaintiff argues that her IQ scores satisfy the listing's requirement. Plaintiff also emphasizes the ALJ's statement that it was "not disputed that the claimant exhibited evidence of mild mental retardation prior to age 22 . . . ," and asserts Plaintiff met the first part of the listing. (Docket Entry No. 18, Plaintiff's Brief, at 14 (citing Docket Entry No. 10, Administrative Record, at 23)). The ALJ found that although Plaintiff "exhibited evidence of mild mental retardation prior to age 22 . . . , [t]here are no IQ scores of record suggestive of IQ scores of 59 or less." (Docket Entry No. 10,

Administrative Record, at 25).

IQ scores after the age of 22 or before may satisfy the listing because under SSA policy, IQ scores tend to stabilize by age 16 and generally remain constant as an adult, absent intervening factors such as an accident or brain damage. See POMS DI 2415.055(A); see also Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001) ("[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning."). "While the claimant may use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period, see Daniels v. Comm'r of Soc. Sec., 70 F.App'x 868, 873 (6th Cir. 2003), a claimant is by no means required to produce an IQ score obtained prior to age 22." West v. Comm'r Soc. Sec. Admin., 240 F.App'x 692, 698 (6th Cir. 2007).

Yet, a mental impairment cannot be severe based solely on the IQ score. See Griffith v. Comm'r of Soc. Sec., 582 F. App'x 555, 559 (6th Cir. 2014) ("While it is well established that an intelligence score may be helpful in assessing whether an individual has a medically determinable mental impairment, it is not the sole determinative criteria, and notably the complainant has not cited a single case where a low I.Q. score was the sole basis for finding an intellectual disability."). To do so "would replace this nuanced evaluation process with a number, and in the process would overlook a core canon of interpretation and several on-point precedents." Barnett ex rel. D.B. v. Comm'r of Soc. Sec., 573 F. App'x. 461, 464 (6th Cir. 2014) (evaluating the childhood listing, 112.05).

Here, the ALJ found that Plaintiff had IQ scores in 2001 and 2012. (Docket Entry No. 10, Administrative Record, at 25). The 2001 IQ scores were above the cutoff level for the listing given Plaintiff's verbal IQ of 83, performance IQ of 78, and a full scale IQ of 79. Id. Plaintiff's 2012 IQ test revealed a full scale IQ of 66 that is within the listing level IQ range. Id. at 535. The state agency

found Plaintiff's lower IQ scores invalid given the higher IQ scores in the past. Id. at 559. The ALJ deemed the 2001 scores were more relevant to Plaintiff's functioning at age 22, and were more reflective of Plaintiff's adaptive functioning. Id. at 25. The ALJ considered the evidence that although Plaintiff was in some special education classes in high school, Plaintiff was graduated from high school, and Plaintiff had an acceptable grade point average. Id. at 25, 320. A special education background alone do not satisfy this listing. Eddy v. Comm'r of Soc. Sec., 506 F.App'x 508, 510 (6th Cir. 2012) (holding that a claimant's eighth grade education with a history of special education classes did not establish deficits in adaptive functioning prior to age twenty-two).

An ALJ may reject IQ scores that are inconsistent with the record. See Foster, 279 F.3d at 352-55 (finding that a ninth-grade education completed through special education classes, followed by numerous unsuccessful attempts at a GED, coupled with an adult full scale IQ of 69, did not establish adaptive functioning deficits prior to age twenty-two). "The Commissioner is not required to accept a claimant's I.Q. scores and may reject scores that are inconsistent with the record. Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998). Indeed, the ALJ should examine test results of this sort to assure consistency with daily activities and behavior. Id." Baker v. Comm'r of Soc. Sec., 21 F.App'x 313, 315 (6th Cir. 2001). The Court reviews this determination to see if it is supported by substantial evidence. See id. ("For purposes of this court's review, the question is whether the decision to disregard Baker's scores as unreliable is supported by substantial evidence.").

Here, the state agency and the ALJ deemed Plaintiff's 2012 IQ score to carry less weight given Plaintiff's higher IQ score in 2001. Given the agency's policy on when an IQ score stabilizes and absent proof of an intervening event to alter Plaintiff's mental capacity, the Court concludes that the ALJ had a rational basis to conclude that Plaintiff did not satisfy the listing based upon her IQ

13

score.

Plaintiff contends that she presented other proof of her deficits in adaptive functioning both prior to age 22 and at the time of the hearing. Plaintiff's mother described Plaintiff's various problems with adaptive functioning. Plaintiff's testimony focused on her problems on the job immediately after high school. (Docket Entry No. 10, Administrative Record, at 1422-23). Plaintiff's mother also testified that Plaintiff has lived the majority of her life with someone else. Id. at 1420. The ALJ considered Plaintiff's jobs, and Plaintiff's daily activities, including keeping appointments, traveling, and shopping. Id. at 25, 267, 290-97. A "work history" coupled with basic educational skills, reflects a "the less severe diagnosis of borderline intellectual functioning, rather than mental retardation," and can demonstrate ability to "adequately manage normal activities of daily living." Justice v. Comm'r of Soc. Sec., 515 F.App'x 583, 587 (6th Cir. 2013). To be sure, the ALJ cannot use unskilled work to show that the claimant's abilities are higher than someone with intellectual disability. Ligon v. Colvin, No. 3:13-cv-00267, 2015 WL 5167873, at **5-6 (M.D. Tenn. Sept. 3, 2015).

Upon review, the Court concludes that the ALJ had substantial evidence to reject this proof given the legitimate bases to reject the credibility of Plaintiff and her mother on Plaintiff's physical limitations.

For these reasons, the Court concludes that Plaintiff's motion for judgment on the administrative record (Docket Entry No. 17) should be denied.

An appropriate Order is filed herewith.

ENTERED this the _11th_ day of January, 2017.

WILLIAM J. HAYNES, JR
Senior United States District Judge